Filed 1/13/26  P. v. Sedano CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062766 |
| v. | (Super. Ct. No. FSB1400896) |
| MARIO SEDANO, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of San Bernardino County, Michael A. Smith, Judge. Affirmed in part, reversed in part and remanded with instructions.

Arthur Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General,

Christopher P. Beesley and Namita Patel, Deputy Attorneys General, for Plaintiff and Respondent.

*        *        *

Mario Sedano appeals his conviction on one count of murder, one count of attempted murder, and other drug and firearms-related counts. Sedano was accused of murdering 16-year-old Jose Eric Martinez and attempting to kill Martinez's older cousin, Victim 2, in connection with a drug transaction in December 2013.

Sedano argues the trial court committed prejudicial error by allowing the prosecutor to elicit hearsay testimony from a witness about the drug transaction. Specifically, the witness testified about hearing one side of a phone call between Martinez's boss, drug dealer Eduardo "Daddy Yankee" Ontiveros, and another person while riding in Ontiveros's car. She could hear what Ontiveros was saying, but not what the person on the other end was saying. The trial court allowed her to testify that she heard Ontiveros discuss selling $20,000 worth of methamphetamine to a third party during the conversation, and that Ontiveros allowed the sale despite feeling wary about it.

In her testimony, this witness testified regarding eight statements about the content of the call; all but one of them are hearsay. The question is whether the hearsay statements were properly admitted under the state of mind exception under Evidence Code section 1250.[1] We conclude they were not, because *Ontiveros's* state of mind or intent was never at issue. However, we further conclude the error was harmless because it was not

_____

[1] All further undesignated statutory references are to the Evidence Code.

2

reasonably probable the jury would have found in Sedano's favor if the hearsay evidence had not been introduced.

Sedano also argues the trial court improperly sentenced him to 15 years to life on the attempted murder count, although the sentencing laws require only a seven-year term be served before eligibility for parole. The Attorney General concurs in this assessment, and so do we. We therefore reverse only the sentence on count two (attempted murder) and remand the matter for resentencing. We affirm the judgment in all other respects.

STATEMENT OF FACTS

The crimes committed in this case were connected to an alleged drug operation headed up by Ontiveros. Ontiveros supplied drugs to customers in San Bernardino and surrounding areas, moving large amounts of them, including heroin and cocaine, through the area. He used four people to deliver the drugs. Two of those four people—Rafael Eladio Torres Moreno and Martinez[2]—were murdered within a few days of one another between December 10 and 15, 2013.[3] Martinez's cousin, Victim 2, was the victim of a shooting that occurred on December 12, 2013.

A.    *Background*

In 2013, Martinez was a teenager living with his mother in Delano. He and his girlfriend, who was only referred to at trial as Jane Doe 1 ("Martinez's girlfriend"), had a baby together. Jane Doe 1 is Ontiveros's niece. She introduced Martinez to Ontiveros in October 2013 at a family

---

[2]  Moreno is often referred to in the record by his nickname "Rafa" and Martinez by his preferred name "Eric." For the sake of clarity and consistency, we refer to the two decedents only as Moreno and Martinez.

[3]  While aspects of Moreno's murder were brought up during Sedano's trial, Sedano was not charged in connection with that murder.

3

get-together. Jane Doe 1 knew her uncle sold drugs. Martinez began assisting Ontiveros in his operation by delivering and selling drugs.

Around Thanksgiving 2013, Martinez moved to San Bernardino to live with Ontiveros and continue assisting him. Ontiveros would tell Martinez where to make his drug deliveries.

Three other people helped with deliveries. One of them, identified only as Jane Doe 2 at trial ("delivery worker"), testified at trial that she, Moreno, Martinez, and her friend Mary all worked for Ontiveros. They were the only ones on whom Ontiveros would rely for his deliveries. Moreno and Martinez would always make their deliveries as a team, never alone. And Ontiveros allowed Martinez and Moreno to use his silver Chevrolet Blazer for this purpose.

B.    *Martinez's Disappearance*

Within two weeks of being in San Bernardino, Martinez told his girlfriend he was going to meet up with someone named Mario for a drug sale.

The last time the delivery worker saw Martinez and Moreno was on the evening of December 8, 2013, when they met at a restaurant. After Martinez and Moreno had gone, the delivery worker, her colleague Mary, and one other person got into Ontiveros's truck to drive to the mountains. Ontiveros was driving and the delivery worker was in the back seat.

At some point during the drive, Ontiveros received a call. The delivery worker overheard Ontiveros discussing a $20,000 deal. She assumed the call had to do with a delivery to a customer.

The delivery worker thought Ontiveros appeared reluctant about the deal. She described him as "real sketchy . . . [l]ike it just didn't feel right to him." He expressed concern that he did not know the person on the other

4

end of the deal, but he ultimately approved it. The conversation lasted about 10 or 15 minutes. Ontiveros told the delivery worker that the phone call had to do with six pounds of methamphetamine. The deal involved a lot more money than the ones she usually handled, which were usually no more than $100.

When the group arrived in the mountains, they stopped at a gas station and turned around to go back to San Bernardino. The following day, December 9, Ontiveros told the delivery worker that Moreno and Martinez had not come home, and they were not answering their phones. He encouraged her to call hospitals and jails to try to find them. The delivery worker made phone calls, including a call to Martinez's girlfriend, to try to locate him, but she was unsuccessful.

Martinez's loved ones also noticed something was troubling him. Martinez was only sporadically contacting his girlfriend, his brother, and his mother, sometimes from unfamiliar phone numbers. In his communications, Martinez seemed nervous, fearful, and upset. He would not tell his loved ones what was happening, but he assured them he was okay and implored them not to call the police. At some point, his girlfriend, mother, and brother lost contact with him completely.

Victim 2 was Martinez's cousin and lived with their grandmother in San Bernardino. Martinez told Victim 2 that he was selling drugs; Victim 2 testified that he saw Martinez driving Ontiveros's silver Blazer. Victim 2 also knew Sedano from their school days.

Victim 2 testified Martinez and Ontiveros had, at one point in time, gone to meet up with Sedano to discuss a drug deal. He thought there was to be an arrangement by which Ontiveros would buy drugs from and also sell drugs to Sedano. After Martinez arrived in San Bernardino, the only

5

people Victim 2 saw Martinez with other than family were Ontiveros and Sedano.

In early December 2013, Victim 2 became concerned for Martinez's safety. Whenever Martinez called Victim 2, Martinez would be nervous—sometimes crying. Victim 2 would ask Martinez where he was, and instead of responding, Martinez would just cry. In the background of the calls, Victim 2 could sometimes hear a voice that sounded like Sedano's.

The last time Victim 2 saw Martinez before his death, they met at a bar. Martinez called Victim 2 from a phone number Victim 2 did not recognize to invite him. Martinez told him to come alone.

When he arrived and parked, Victim 2 observed Martinez and Sedano arrive in a black Mercedes-Benz. Both men got out of the Mercedes. Victim 2 noticed Martinez hung back and allowed Sedano to approach Victim 2 first. Martinez's eyes were wide and his fingers were shaking.

Victim 2 told Sedano to take care of his cousin, and not to hurt him. Sedano responded with a smile. Victim 2 got into his car to leave and saw Sedano and Martinez get back into the Mercedes and drive onto the freeway toward Riverside.

After that, Victim 2 tried, mostly unsuccessfully, to call Martinez. He also called Sedano to ask where Martinez was. Sedano would not tell him, only saying that Martinez was okay. On one or two occasions, Victim 2 was able to speak to his cousin, but Martinez would only respond with one-word "yes" or "no" answers in a scared tone of voice. Martinez also instructed his cousin not to call the police. Victim 2 complied because he was afraid something bad would happen to Martinez otherwise.

6

C.     *Discovery of Moreno's Body*

On December 10, 2013, around 1:30 a.m., police responded to a report of a body found in a dirt lot in San Bernardino. The victim was identified as Moreno. He had been shot multiple times.

Police found a total of eight spent cartridge casings at the scene, all from a .45-caliber weapon. The casings all had Winchester stamped on the head stamp.

D.     *Shooting of Victim 2*

Two nights later, Victim 2 stopped at home before going to visit his uncle in the hospital. Sedano pulled up in his black Mercedes and got out. He was wearing all black, including black leather gloves. He began walking toward Victim 2, saying Victim 2 was "a loose string." Sedano angrily told Victim 2 he had disrespected him.

Sedano then reached toward the back of his waistband, asking whether there was anyone at home. Victim 2 falsely stated his grandmother was there. He began to turn as he saw Sedano remove something from the back of his pants and then heard and felt gunshots to his thigh and foot. He fell to the ground and tried to play dead so Sedano would leave.

He estimated five to six rounds had been fired, but admitted the whole thing was a blur and he was unable to provide exact details from the shooting which had occurred nine years before the trial. Police found 16 spent cartridge casings at the scene; they were all .45-caliber Winchester brand casings.

At the hospital, Victim 2 identified Sedano as the shooter from a six-pack photographic lineup. He also told police the shooter had a tattoo on his arm saying "Sedano."

*E.    Discovery of Martinez's Body*

On the morning of December 15, 2013, a pedestrian walking his dog discovered a male sitting in the driver's seat of a silver Chevrolet Blazer parked on a residential street in San Bernardino. The man did not appear to be breathing, so the pedestrian called police. The man in the SUV was later identified as Martinez.

In one of Martinez's pants pockets was a small piece of paper, with three names and phone numbers on it. One of the names was "Mario." The police noticed the possible connection to Victim 2's shooting.

An autopsy revealed Martinez had suffered five gunshot wounds to his torso and arm. The cause of death was a gunshot wound to the chest. The manner of death was established as homicide.

The police collected five expended .45-caliber cartridge casings from the scene. All of the casings were found in the Blazer's interior. Forensic specialists lifted latent fingerprints from the inside of the front passenger window and outside of the driver's front door.

The expended cartridge casings from all three shootings were taken to the San Bernardino County Sheriff's Department crime lab for forensic analysis. The crime lab determined that some of the casings from Victim 2's shooting matched those from the Martinez killing. The matching casings had been fired from a Taurus Model PT1911 firearm. The remaining casings from Victim 2's shooting were from an unknown .45-caliber weapon; a second shooter was never identified.

*F.    Sedano's Arrest and Search of His Residence*

On January 2, 2014, Sedano was stopped while driving his black Mercedes and taken into custody for the attempted murder of Victim 2. Buccal swabs were taken for DNA, and a search warrant was executed at his

8

residence and on his vehicles. Two black gloves were collected from the back of Sedano's Mercedes. Gunshot residue was discovered on the gloves.

Police also discovered four guns at Sedano's residence, one of which was a Taurus PT1911 .45-caliber semi-automatic pistol. They also found a magazine with eight live rounds of .45-caliber Winchester ammunition.

Forensic specialists swabbed all of the firearms in the textured areas of the grip, the slide action area of the firearm, and the trigger for potential touch DNA evidence.

A firearms specialist in the crime lab examined the Taurus PT1911 pistol and compared it to the spent casings found at the scenes of the Moreno, Victim 2, and Martinez shootings. She testified that the Taurus pistol did not match the casings at the Moreno murder scene. However, it matched all five casings found in the vehicle with Martinez, and seven of the casings found at the scene of Victim 2's shooting. The specialist determined that two firearms were likely used in Victim 2's shooting.

Sedano's DNA was also compared to DNA samples found on the grip, trigger, and slide of the Taurus pistol. Initial analysis in 2014 showed a mixture of at least four people's DNA in the sample coming from the slide. However, in 2022, more analysis was done on the grip and trigger of the gun, which showed that Sedano was 180 billion times more likely than another randomly chosen person to be one of the contributors to the DNA samples found on the pistol.

PROCEDURAL HISTORY

A felony complaint against Sedano was filed, alleging he murdered Martinez (Pen. Code, § 187, subd. (a)), with special allegations of personal and intentional discharge of a firearm causing great bodily injury

9

(*id.*, § 12022.53, subd. (d)), personal and intentional discharge of a firearm (*id.*, § 12022.53, subd. (c)), and personal use of a firearm (*id.*, § 12022.53, subd. (b)). A first amended felony complaint was filed weeks later, adding to the charges the attempted murder of Victim 2 (*id.*, §§ 664, 187, subd. (a)), possession of a controlled substance (Health & Saf. Code, § 11378), and possession of a controlled substance with a firearm (*id.*, § 11370.1, subd. (a)). Sedano pleaded not guilty.

The case went to a jury trial on all four counts. The jury heard testimony from over 30 witnesses, including Sedano, who testified in his own defense. Among the witnesses testifying for the prosecution was the delivery worker.

## A. *The Delivery Worker's Testimony Regarding the Ontiveros Phone Call*

The prosecutor asked the delivery worker whether Ontiveros had told her about a plan for Martinez and Moreno to meet up with Sedano. She testified that Ontiveros had not told her. When asked how she learned of the meeting, she said she heard Ontiveros on the phone. The prosecutor asked the delivery worker to clarify that Ontiveros was speaking with Martinez and Moreno, at which point defense counsel objected based on lack of foundation because the delivery worker had not said she could hear both sides of the conversation. The trial court sustained the objection.

The prosecutor then asked: "So you heard [Ontiveros] on the phone, talking about an arrangement that [Martinez] and [Moreno] were going to meet up with [Sedano] for some kind of transaction, correct?" The delivery worker answered, "Correct." Defense counsel did not object to this question or its answer but did object when the prosecutor asked the delivery worker to tell the jury what she heard. Defense counsel asserted the testimony amounted to double hearsay. At this point, the trial court took a

10

recess so that it could assess the defense's hearsay objection outside the presence of the jury.[4]

B.     *Section 402 Testimony*

During her section 402 testimony, the delivery worker agreed that she would have assumed, based on her knowledge of Ontiveros's business, that Martinez and Moreno must have been on the other end of the line if the call involved a drug deal. She heard Ontiveros ask the other person with whom the deal would be. After the call, Ontiveros told her he had spoken with the third party involved in the deal, and he mentioned the name Mario. However, when the call took place, the $20,000 deal was already going on. The court appeared skeptical that the call was exempt from the hearsay rule as a statement of a plan or intent to have a meeting, as the prosecutor had argued. And defense counsel noted the prosecution had not produced Ontiveros himself to testify about the call.

The court ruled the delivery worker could testify before the jury that (1) Ontiveros received a call, (2) there was a discussion about a $20,000 deal, and (3) Ontiveros was reluctant to do the deal. The prosecutor could not ask the delivery worker to identify the person on the other end of the deal.[5] Once the jury was back in the courtroom, the delivery worker was permitted to testify on these topics.

---

[4] Though it did not explicitly label it as such, we assume the trial court wished to conduct a hearing pursuant to section 402, subdivision (b).

[5] No one present appeared to notice that the delivery worker had already agreed— in front of the jury, prior to the recess—that Ontiveros was talking on the phone about a meeting between Moreno, Martinez, and Sedano.

11

The jury convicted Sedano on all charges. The trial court sentenced him to 25 years to life in prison on the murder charge and 15 years to life on the attempted murder charge. Additionally, the court imposed sentences of 25 years to life on each of the firearm enhancements pursuant to Penal Code section 12022.53, subdivision (d), and imposed but stayed the enhancements under Penal Code section 12022.53, subdivisions (b) and (c). Sedano was sentenced to another five years on the possession of controlled substances charges. Sedano's total sentence was 90 years to life in prison plus an additional five years.

## DISCUSSION

On appeal, Sedano raises two issues. First, he contends the trial court erred by allowing the delivery worker to testify about Ontiveros's phone call regarding the purported plan for Martinez to do a $20,000 deal. Sedano claims the testimony was double hearsay and it did not fit within any valid exception to the hearsay rule. Moreover, he contends the evidence was prejudicial to his defense because it tended to bolster Victim 2's credibility.

We agree with Sedano that the testimony elicited was inadmissible under the hearsay rule, but we conclude the error was not prejudicial and does not require reversal of his convictions.

Second, Sedano argues the trial court imposed an unauthorized sentence of 15 years to life on the attempted murder count. He correctly points out that a sentence of life with the possibility of parole requires the defendant to serve only seven years before he is eligible for parole. (See Pen. Code, § 3046, subd. (a).)

12

# I.

## STANDARD OF REVIEW

"A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10; see also § 353, subd. (b).)

We review the length of Sedano's attempted murder sentence de novo, as it involves an issue of statutory construction. (See *People v. Jefferson* (1999) 21 Cal.4th 86, 94.)

# II.

## THE DELIVERY WORKER'S TESTIMONY REGARDING THE SUBSTANCE OF THE ONTIVEROS PHONE CALL WAS INADMISSIBLE HEARSAY

*A.    Applicable Law*

Hearsay "is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (§ 1200, subd. (a).) Hearsay is inadmissible except as provided by law. (*Id.*, subd. (b).)

The exceptions to the hearsay rule are identified in the Evidence Code and have also developed in the decisional law. (See *In re Cindy L.* (1997) 17 Cal.4th 15, 26.) At issue here is section 1250 pertaining to statements of the hearsay declarant's existing mental or physical state. Unless it is made "under circumstances such as to indicate its lack of trustworthiness" (see § 1252), "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health)" is not subject to the

13

hearsay rule if one of two preliminary facts is established (§ 1250, subd. (a)). The first is that the "evidence is offered to prove the declarant's state of mind" where declarant's state of mind "is itself an issue in the action." (*Id.,* subd. (a)(1).) The second is that the "evidence is offered to prove or explain acts or conduct of the declarant." (*Id.*, subd. (a)(2).)

## B.     *Multiple Levels of Hearsay and State of Mind*

Where statements are introduced secondhand, each individual level of hearsay must fall within the scope of an exception for the multi-layered statements to be admissible as a whole. (See § 1201.) The delivery worker's testimony contained two levels of potential hearsay. One level is what Ontiveros himself was saying, either into the phone or to the delivery worker. The second level is what the person on the other end of the line was saying to Ontiveros. The statements in question were only admissible if the state of mind exception applied on both levels.

The exception does not apply on the first level because Ontiveros's state of mind was never an issue in the case. At best, the state of mind exception might apply to the second level of statements by Martinez, if he indicated that he intended to meet Sedano.[6] This scenario was present in *People v. Majors* (1998) 18 Cal.4th 385, a case cited by Sedano, but not addressed by the Attorney General. In *Majors*, multiple witnesses testified that the murder victim himself told them he was going to be doing a

---

[6] The delivery worker did not testify to any such statements. Instead, the prosecution was able to establish, essentially by a process of elimination, that only Martinez or Moreno could have been on the other end of the call and that Sedano was likely the third party involved in the deal. But the delivery worker did not testify that she heard Martinez himself say anything about meeting Sedano.

14

methamphetamine deal at his home with people from Arizona. (*Id.* at pp. 403–405.) From this, it could be inferred that the victim did indeed do a deal with people from Arizona at his home. Here, by contrast, it was not Martinez speaking but Ontiveros, who was not a victim or a defendant in this case. Since only Martinez's statements could fall within the exception, all hearsay statements by Ontiveros were inadmissible.

The Attorney General asserts Ontiveros's state of mind was relevant because defense counsel suggested in his closing that Ontiveros was a potential alternate suspect who was never investigated by police. As Sedano notes, though, this was not the purpose for which the phone call was being introduced. The prosecution offered the delivery worker's testimony regarding Ontiveros's side of the phone call to show that Martinez went to meet Sedano. Ontiveros's intent, plan, or state of mind has nothing to do with that.

C.    *Specific Testimony*

To make a more precise assessment of the hearsay nature of the delivery worker's testimony, we identify several excerpts of her testimony pertinent to the Ontiveros phone call below; all but the final excerpt came from her testimony after the trial court conducted the section 402 hearing.

Excerpt No. 1—Inadmissible

"Q Did you hear [Ontiveros] talk about something involving $20,000?

"A Yes."

Excerpt No. 2—Inadmissible

"Q Okay. And on this particular truck ride to the mountains, did you hear [Ontiveros] talk about on the call that this was about a 20,000-dollar deal?

15

"A Yes."

These two excerpts are hearsay because they were offered to establish the fact that there was a deal. Ontiveros's state of mind was not at issue.

Excerpt No. 3—Admissible

"Q Okay. And in this call, did [Ontiveros] appear to be reluctant about allowing the deal to go through?

"A Yes."

This is not hearsay evidence, because there is no statement. Instead, the delivery worker gave her opinion about Ontiveros based on her observation of him during the phone call.

Excerpt No. 4—Inadmissible

"Q And then at the end of the conversation, did [Ontiveros] agree that the transaction could go through? Did he say okay?

"A Yeah."

This is hearsay evidence because the delivery worker was testifying that Ontiveros said "okay" to prove that he approved the deal. His intent to allow the deal to proceed is not relevant.

Excerpt No. 5—Inadmissible

"Q Okay. In the 10 or 15 minutes that the conversation was going on, when you're listening to [Ontiveros] talk on the phone, was the conversation only about this 20,000-dollar deal?

"A Yes."

This is hearsay for the same reason as Excerpt Nos. 1 and 2.

Excerpt No. 6—Inadmissible

"Q Did [Ontiveros], in the call, make statements to the effect of he didn't know the person who was on the other end of the deal?

16

"A Yes.

"Q I'm not talking about the person that [Ontiveros] was—the person he was talking to on the phone. But the person on the other end of the 20,000-dollar delivery deal.

"A Yes."

This is hearsay because it was offered to prove what it asserts—that Ontiveros did not know the buyer. The prosecution argued that statements such as this were relevant for a nonhearsay purpose of establishing Ontiveros's reluctance to go ahead with the deal. But absent any identification of Sedano on the call as being the buyer, Ontiveros's reluctance about the deal is irrelevant.

Excerpt No. 7—Inadmissible

"Q At some point, did you become aware of anything about six pounds of meth?

"A Yes.

"Q And how did you become aware of six pounds of meth?

"A [Ontiveros] had told me and [a colleague] that that's what the phone call was about."

This is hearsay because it is being offered to prove the deal involved six pounds of methamphetamine, and Ontiveros's state of mind is irrelevant.

Excerpt No. 8—Inadmissible

"Q Okay. So you heard [Ontiveros] on the phone, talking about an arrangement that [Martinez] and [Moreno] were going to meet up with [Sedano] for some kind of transaction, correct?

"A Correct."

17

This excerpt of the delivery worker's testimony took place before the section 402 testimony. It is undoubtedly hearsay because it is being offered to prove Moreno and Martinez were going to meet up with Sedano. Also, this testimony would have been in violation of the trial court's later ruling that the delivery worker was not to testify about who the deal may have been with.

In sum, seven out of the eight excerpts about the phone call were inadmissible under the hearsay rule.[7]

### III.

### THE ERROR WAS HARMLESS BECAUSE IT IS NOT REASONABLY PROBABLE THE JURY WOULD HAVE REACHED A DIFFERENT RESULT ABSENT THE ERROR

Erroneous admission of hearsay evidence is subject to the harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818. (See *People v. Jasso* (2025) 17 Cal.5th 646, 679.) Therefore, Sedano must show "that it is . . . reasonably probable that a result more favorable to [him] would have been reached in the absence of the error." (*Watson*, at p. 837.)

Sedano contends the evidence about the Ontiveros phone call prejudiced him because it tended to bolster the credibility of Victim 2, who he argues was the prosecution's main witness. We disagree, because Victim 2 was not the only one who testified about Martinez's connection with Sedano. Martinez's girlfriend testified that Martinez and Sedano were to meet at some point in time. Specifically, she testified that, within two weeks of his

---

[7] The Attorney General proffers three alternative grounds upon which the phone call was admissible. Since these grounds were not advanced in the trial court, we deem them forfeited under section 353, subdivision (a).

arrival in San Bernardino, Martinez mentioned "Mario" and told her he was planning to meet up with Mario for a drug sale.

Moreover, Victim 2's testimony was bolstered by other evidence. Victim 2 testified about receiving frightened calls and texts from Martinez. His testimony was corroborated by Martinez's girlfriend, Martinez's brother and Martinez's mother—all of whom had received similar communications from Martinez in the days leading up to his disappearance.

Finally, other evidence linked Sedano to both crimes, in particular, the gun. Sedano was a likely contributor to the DNA evidence found on the grip, trigger, and slide part of the Taurus pistol used to kill Martinez. That pistol was also determined to be one of the weapons used to shoot Victim 2. The gun was found in Sedano's room, along with .45-caliber Winchester ammunition matching casings found at the scenes of both crimes. Additionally, a pair of black gloves with gunshot residue was discovered in his car. Victim 2 testified Sedano was wearing black gloves during his shooting. This evidence was sufficient to convict Sedano, and he does not argue any of it was inadmissible.

IV.

SEDANO'S SENTENCE ON THE ATTEMPTED MURDER CHARGE IS UNLAWFUL

Sedano argues the trial court unlawfully sentenced him to 15 years to life in prison for attempted murder. Sedano argues, and the Attorney General concedes, the correct sentence under Penal Code section 3046, subdivision (a)(1), is seven years to life. We agree that the sentence is incorrect, and we therefore reverse and remand so the trial court can sentence Sedano correctly on the attempted murder count.

19

## DISPOSITION

The sentence imposed on count 2 for attempted murder is reversed and the matter is remanded for resentencing only. The judgment is affirmed in all other respects. After resentencing, the trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


BANCROFT, J.*

WE CONCUR:


GOODING, ACTING P. J.


SCOTT, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.